Denise Marie Thomas
Pro Se Attorney
P.O. Box 1573
Veradale, WA 99037
509-714-7536

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF EASTERN WASHINGTON

DENISE MARIE THOMAS, in her capacity as an

Individual,

                             Plaintiff,

        v.

UNITED STATES

               Defendants,

# CV-10-073-LRS

**COMPLAINT FOR DAMAGES**

**CONSPIRACY AGAINST RIGHTS;
DEPRIVATION OF RIGHTS
UNDER COLOR OF LAW;
INVASION OF PRIVACY;
NEGLIGENCE; INTENTIONAL
EMOTIONAL DISTRESS;
MALICIOUS HARASSMENT;
OUTRAGOUS CONDUCT;
ILLEGAL SURVIELLENCE;
ILLEGAL WIRETAPPING**

<u>(DEMAND FOR JURY TRIAL)</u>

**COMPLAINT FOR INJUNCTION RELIEF**

COMES NOW the Plaintiff, Denise Marie Thomas, an individual in her capacity,

acting as Pro Se attorney for herself and alleges as follows:

RECEIVED

MAR 2 2 2010

CLERK, U.S. DISTRICT COURT
SPOKANE, WA

1

## INTRODUCTION

1.     This is a complaint for money damages against the United States, specifically the Spokane Office of the Federal Bureau of Investigation, its agents and unknown John Does (all collectively "defendants") for violations of Ms. Thomas' constitutional and federal civil rights asserting claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 (FTCA); 343 F3d 945 Raz v. United States.

2.     Plaintiff alleges the defendants continue to engage in nine-year "illegal surveillance operation of harassment" conspiring with local law enforcement creating a form of "Modern Day Slavery" and literally treating the plaintiff as if she is an "enemy of the state." This unlawful act is soley the reason why Ms. Thomas has experienced a overwhelming number of law enforcement stops, encounters and an unlawful arrest with a third degree assault conviction which has ultimately effected her ability to obtain general employment.

3.     The defendants have used this unlawful act to make the plaintiff financial insolvent by using surveillance tactics to intercept and sabotage her attempts to make an income in proportion with her degrees and education.  The defendants have used monitoring devices such as infrared thermal imaging within or outside her residences to monitor and stalk her whereabouts and invade her personal privacy and control her freedom; issued "ALERTS" to local law-enforcement agencies and other business security so that she is immediately recognized wherever she goes; tapped her cell phones, planted electronic tracers and listening devices in her former cars; violated public trust within the community by claiming the plaintiff was under investigation based on her race or sexual orientation and further placing the plaintiff's life in danger; manipulated and monitored her debt to that resulted in legal judgments at her employment, garnishing her paychecks, conspiring with local law enforcement and other

security businesses to extend the harassment on the day or week of her payday as well as

invading her financial privacy to embarrass, control and humiliate, and conduct a siege of

threatening debt collection calls; conducted "sting-operations" that were "extremely insulting,

cruel, inhuman, immoral and demeaning," one where she received a voicemail at her job from a

Seattle DEA agent, she never called, mocking the death of her recent grandmother's death

allegedly murdered by a drug-crazed relative in New Orleans or when her vehicle was often

surrounded by a variety of different agencies of law enforcement at the time of her routines

stops often outside or nearby her employment or within her community; used covert

surveillance to intercept and monitor her computer communications to sabotage potential

income, job opportunities, personal privacy and mail parcels and continue to injure, oppress,

deprive, threaten, intimidate and humiliate the plaintiff up until the time she has filed this suit,

28 U.S.C. § 2401(b).

## JURISDICTION

4.      These claims arise under 42 U.S.C. 1983, the Court has jurisdiction over the state law

claims pursuant to the doctrine of pendent jurisdiction.  Section 1981 of Title 42 (Equal Rights

Under the Law) protects individuals from discrimination based on race in making and enforcing

contracts, participating in lawsuits, and giving evidence. See 42 U.S.C. § 1981. Other statutes,

derived from acts of the reconstruction era, that protect against discrimination include: Civil

Action For Deprivation of Rights (See 42 U.S.C. § 1983) Conspiracies to Interfere With Civil

Rights (See 42 U.S.C. § 1985); Conspiracy Against Rights of Citizens (See 18 U.S.C. § 241);

Deprivation of Rights Under Color of Law, (See 18 U.S.C. § 242); Foreign Intelligence

Surveillance Act illegal wiretapping and electronic eavesdropping, 18 U.S.C. 2511(1);

5.    The Jurisdictional Statue for Civil Rights Cases (See 28 U.S.C. § 1443); Peonage

Abolished (See 42 U.S.C. § 1994).  Events taking place more than two years prior to the

Plaintiff's March 2009 administrative claim are not time-barred, because Ms. Thomas alleged

the FBI continued to engage in surveillance activities up until and beyond the date she filed her

suit. See 28 U.S.C. § 2401(b) (tort claim against United States is forever barred unless it is

presented in writing to appropriate federal agency within two years after claim accrues); Gross v.

United States, 676 F.2d 295, 300 (8th Cir.1982) (where tortious conduct is continuing in nature,

statute of limitations for FTCA claim runs from date of last tortious act).

6.    Costs and attorney fees may be awarded pursuant to 42 U.S.C. 1988. Pro se litigants may

be entitled to Attorney fees and costs under the Civil Rights Attorney's Fee Award Act of 1976,

90 Stat. 2641, as amended 42 USC 1988.

## PARTIES

6.    Ms. Thomas, an individual, is a citizen of the United States and a resident of the City of

Spokane and has been a resident of Spokane Valley, Washington.

7.    Defendant United States is sued individually.

8.     At all times mentioned herein, defendants were acting under color of statutes, ordinances,

regulations, policies, customs and usages of the State of Washington, Spokane County and City

of Spokane within the scope of their employment.

## FACTS

9.    Since the year 2007, Denise Marie Thomas, an independent documentary filmmaker, has

continued to experience law enforcement stops and encounters.

10.    In 2004, the plaintiff filed a complaint to the Spokane County Sheriff's Office citing

detailed documentation of five stops in 2002, nine stops in 2003, four stops in 2004.  The

complaint literally showed she had come in contact with approximately 18 deputies, some more than once, and seven Washington State Patrol officers, all in Spokane Valley where she resided at the time. The Sheriff's office responded and denied all wrongdoing. She received various traffic tickets, fines and made several appearances in court to dispute the citations.

11.     Ms. Thomas tried repeatedly to obtain private counsel for a potential claim of criminal harassment or racial profiling. She attempted to seek legal counsel for her series of stops in which she had bona-fide evidentiary support by documentation. She made all calls mainly from her cellular phone within her car or while out on errands. She was unsuccessful in securing legal counsel often being told she had no case.

12.   Yet, Ms. Thomas' encounters with law enforcement continued.

13.   On approximately January 29, 2007 at approximately 12:38 or 12:40 a.m. Ms. Thomas was headed home and drove Southbound down Argonne Road in the Spokane Valley.

14.   She made a left hand turn on to East Montgomery Avenue. She noticed there was light traffic if none at all. As she traveled down East Montgomery Ave she passed various industrial businesses. Between N Woodruff Road and the upcoming railroad tracks, she witnesses to her right a Spokane County Sheriff patrol car parked outside of an industrial business with it's parking lights on and a deputy sitting inside.

15.   Ms. Thomas continued her travel down East Montgomery Ave and then notices her Clorox bottle of bleach sitting on her passenger seat, from an earlier laundry outing, fall to the floor. Directly after this, she also witnessed in her rearview mirror a Sheriff Patrol car appearing behind her car approximately two-car lanes back. In an effort to make sure the bleach was not spilling on the floor, Ms. Thomas turned on her right-hand turn signal and pulled over to the side of the road to tighten the cap.

16.   As she pulled over to the side of the road, the Sheriff patrol car eventually caught up with her car and ignited its emergency lights and pulled over to the side of the road and parked behind her.

17.   By this time, Ms. Thomas was already out of her car standing at the passenger side retrieving and tightening the cap on the Clorox bottle of bleach that had fallen to the floor.

18.   While she was doing this, the Sheriff Deputy approached and asked her what she was doing.  Ms. Thomas told him and then asked him was there a problem? He responded that he had received a call of a suspicious vehicle in the area that fit the description of hers.  Ms. Thomas asked "What area?" and the deputy stated "In the Meadow Ridge apartments on Mansfield."  She informed him she certainly wasn't doing anything suspicious and then further added she did find it odd of his encounter as she has endured several stops from Spokane Sheriff Deputies.

19.   He then excused himself and stated he needed to check on something and headed back to his car where he sat looking at his computer and talked on a cell phone.

20.   He returned to Ms. Thomas in a nervous matter and stated he was only saying "hi." To Ms. Thomas, it was obvious he had clearly changed his story from moments before.

21.   Ms. Thomas then asked his name and he stated Deputy Wells.  He told her to have a good night and left.

22.   Even after this incident, Ms. Thomas' law enforcement encounters continued.

23.   On Thursday, February 8, 2007 at approximately 1:20 pm, Ms. Thomas crossed the street at West Pacific Avenue and South Washington Street heading southbound to my car parked at a timed meter.  Immediately, a Spokane city police car sped to where she was standing positioning the car in front of her.  As she continued over to her car parked at the meter and the officer, an older man, yelled out the window, staring directly at her, " Sidewalk!" and drove off, Ms. Thomas noted the patrol car number as 352 for her records.

24.   On Saturday, February 10, 2007, at approximately 8 pm, Ms. Thomas exited out of Albertsons supermarket on Argonne Road and Trent Ave in the Spokane Valley.  Upon leaving

the store entrance, she witnessed a White Spokane County Sheriff patrol car exit off Trent Ave from heading Westbound and drove in front of her parked car in the parking lot and stopped.

25.    As Ms. Thomas approached her car, she saw the patrol car in her full.  The officer continued to stare directly at her as she put her bags in her vehicle.  She started her car and before leaving rolled down the passenger window asking "is there a problem, Officer?" He responded with a smirk stating, "I was just thinking about buying a lottery ticket."  Ms. Thomas responded, "what?" and he responded sternly "just move along ma'am." Ms. Thomas drove off, then noticed the officer headed off in a different direction, she was able to note his patrol car number as 756.

26.    On March 2, 2007, Ms. Thomas had left the apartment where she resided in Spokane Valley, entered onto Mansfield Road to turn left onto Pines Road.  She headed to the exit ramp, approximately a mile and a half away, to head Westbound on I-90.   As she entered onto I-90 within minutes, she noticed an unmarked Washington State Patrol car appeared behind her and stopped her for speeding.

27.    On March 25, 2007, Ms. Thomas traveled Westbound on 2nd Ave and made a right-hand turn on to Division Street heading Northbound in the far right lane.  To her left she noticed a City of Spokane police officer patrol car immediately appear on her driver's side heading in the same direction in the next lane.  As Ms. Thomas headed to the exit that would put her on Sprague Ave heading Eastbound, she noticed the Spokane city patrol car made a lane change and was now directly behind her.  As she waited to enter onto Sprague heading Eastbound the Spokane city patrol car was waiting behind her as well.

28.    Ms. Thomas continued her travel now in the far right-hand lane on Sprague heading Eastbound.  The Spokane patrol car made another lane change and was now next to her again on her driver's side this time passing by but with the Male officer staring directly at her.  His car sped up and she was able to see his patrol car number as 373.  She continued her travel down Sprague and the Spokane Police patrol car, now approximately 5 blocks ahead, turned on a side street.

29.    Approximately, three blocks from the corner of Havana and Sprague.  Ms. Thomas witnesses a Spokane Valley Police patrol car appear at the intersection heading Westbound down Sprague passing her and immediately turning left into the Kmart shopping plaza making an aggressive u-turn to enter back onto Sprague Ave heading Eastbound, approximately 3 car spaces behind Ms. Thomas' car which was waiting at a red light at the intersection of Havana and Sprague.   Ms. Thomas decides to change her direction as she has been told in the past to detect if she is being targeted.

30.    She decides to make a right-hand turn on Havana heading Southbound.  As she heads down Havana, she notices in her rearview mirror, the same Sheriff Deputy patrol car has also turned onto Havana, now 2 car spaces behind her.   Ms. Thomas decides to make a left hand turn on 2nd Ave and stops in front of a residential double wide home at the corner and begins to look for her phone in her suitcase.   Within minutes, the Sheriff deputy makes a turn onto 2nd Ave, slows down near her car, staring directly at her, rolls down his window and asks her while looking at his computer is she is there to see the residence he gives by specific name.  Ms. Thomas replies, "No, I'm about to make a phone call."

31.    The deputy rolls up his window and speeds off down E. 2nd Ave.  At this moment, Ms. Thomas decides to head home continuing down E. 2nd Ave.  Before she gets to the next block she witnesses the Sheriff Deputy farther down make a u-turn and head back in her direction now heading Westbound on 2nd Ave.

32.    As Ms. Thomas makes it to the next block at 2nd Ave and South Dearborn road, the Sheriff Deputy ignites it emergency lights and make a u-turn positioning his car directly behind hers.

33.    He approaches her car and asks what she is doing in the area. Ms. Thomas informs him she is heading home and asks why she is stopped.  He states "well you didn't use your turn signal back there when you turned on this street, so excuse me for a minute."  The deputy heads back to his car and begins talking on his cell phone and looking at his computer. As Ms. Thomas waits a City of Spokane police car arrives and slows down and parks across the street

8

where Ms. Thomas and the deputy patrol car is located.

34.    Ms. Thomas notices it's patrol car number 373, the same one she encountered as she drove down Division Street and onto to E. Sprague.

35.    After approximately ten minutes, the Sheriff deputy returns back to her car to state he ran out of tickets on his pad and so he needed to call in for someone to bring a fresh pad.  He asks her to wait and returned to his car.  The Spokane police remained across the street, neither engaging with the Sheriff or Ms. Thomas.  However, at this point, she has visibly two law enforcement patrol cars in adjacent to hers.

36.    After approximately 20 minutes, a sheriff deputy car appeared, parked and headed over to the deputy parked behind Ms. Thomas.  The new arriving deputy then walked up on Ms. Thomas' passenger side as she waited in an attempted to peek inside at the contents on her passenger seat where her briefcase sat.  Now, at this point, Ms. Thomas had three visible law enforcement cars adjacent to her car.

37.    Ms. Thomas asked if he had a questioned and then asked his name.  He stated "Rick Fox, everything should be okay now." It should be noted, that after this stop, Ms. Thomas called the Sheriff department to get a factual account of all officers involved in her stop and she was informed Rick Fox was actually Mark Fox, a supervisor of Deputy Truman.

38.    Ms. Thomas was then issued a ticket for a "no turn signal" violation with a fine.  After Deputy Truman pulled out to leave, Deputy fox did the same and the Spokane police car left as well.

39.    Ms. Thomas stated behind, grabbed a pad and pencil from her briefcase and made significant notes about the entire stop, locations, conversation and all law enforcement involved.

40.    In the next two months, Ms. Thomas again encountered law enforcement.

41.    So on May 10, 2007, Ms. Thomas, was out on routine jog where she reached the intersection of Mirabeau Parkway and Pines Roads, both public streets, at approximately from 12 to 12:30 pm.  Through the duration of her jog she carried in her hands her keys attached to a

blue lanyard with a long string.

42.    While she was stopped on the sidewalk facing southbound to stretch her arms and calves the string from the lanyard flapped about while in her hand.  During this time, Ms. Thomas continued her stretching movements and noticed two Spokane Valley Police cars exit from Buckeye Ave up the street and proceeded to speed northbound down Pines Road with no emergency lights flashing heading to Trent Ave.

43.    Approximately half way to Trent Ave, Ms. Thomas witnesses one of the Spokane Valley Police cars abandoned its high-speed pursuit and make a u-turn back up Pines Road now going Southbound.

44.    At this point, this action caught Ms. Thomas' eye and she stood on the sidewalk watching the car heading back in her direction that ended up making a u-turn across Pines Road to park in front of the sidewalk where she was standing.

45.    Deputy Jeffery L. Welton quickly exited his patrol car in a hostile manner and ordered Ms. Thomas to come to him.

46.    As Ms. Thomas complied and stepped off the sidewalk to walk toward Deputy Welton when he began accusing her of throwing something at his car.

47.    Ms. Thomas informed him she did not throw anything at his car and then asked if he saw something on his car camera.  Deputy Welton became immediately even more hostile and continued with his accusation and added further that Ms. Thomas was jogging in the middle of the street.

48.    When Ms. Thomas assured him she was certainly not running in the middle of the street, Deputy Jeffery L. Welton ordered her to step back on the sidewalk.

49.     At this point, Ms. Thomas read Deputy Welton's nametag and recognized his name and face from two previous stops she reported in her 2004 complaint to the Spokane County Sheriff's Office about continuous stops with Sheriff Deputies.

50.     Within minutes, Deputy Welton's temper escalated and he immediately grabbed her wrist, twisting her around and throwing her to the ground where her head met the concrete sidewalk and her body rolled over into the grassy area with Deputy Jeffery L. Welton on top of her with his knee in her back.

51.     Ms. Thomas was never read her Miranda Rights but was informed she was under arrest for disorderly conduct and resisting arrest while she was on the ground. While on the ground Ms. Thomas repeatedly asked for medical attention in which she was initially denied.

52.     Patrol backup arrived and Deputy Welton pulled Ms. Thomas up in a rough manner while handcuffed and brought her to the nearby parking lot to place her in a waiting patrol car. The aggressive handling continued from Deputy Welton as he put Ms. Thomas in the backseat.

53.     Fire and Ambulance service had arrived on scene.  At this time, Ms. Thomas was informed by Deputy Welton, he was going to take her out of the backseat so the medics could check her head.  Though other officers where present, Deputy Welton remained as the only Deputy on sight to continually physically handle Ms. Thomas.

54.     Deputy Welton reached in the backseat and grabbed Ms. Thomas in an aggressive manner attempting to spin her around by her knees to face the door.  He then attempted to grab her skull pushing her head down to scoot her out of the backseat all the while pulling her toward him. As Ms. Thomas tried to move in unison with Deputy Welton to get out of the restricting small backseat her leg came in contact with his.

55.    At this moment, Deputy Welton gladly laughed and informed her she was now charged with third degree assault on an officer.

56.    Ms. Thomas was then dragged off of the remaining backseat and placed on the ground between two patrol cars.

57.    Medical professionals looked at her head wounds.  She was then placed back in the car once again handled by Deputy Jeffery L. Welton in the same aggressive rough manner.

58.    Ms. Thomas was then later driven by Deputy Jeffery L. Welton to the Spokane County Jail where he continued to antagonize and interrogate her in the backseat.  She was booked and detained overnight in a cell, up to 72 hours.

59.    At her June 2008 trial, Ms. Thomas was convicted of 3rd degree assault on an officer with both charges of disorderly conduct and resisting arrest dropped.  She handled her sentencing pro se and was given no jail time and one-year probation, court costs approximately of $800.  She continued pro se, after terminating her previous counsel and filed her appeal and later received public defender assistance.  Her conviction was reversed on appeal December 24, 2009 due to court error of unanimity in the jury instructions.  The remaining charge of third degree assault remained open to be retried by the Superior court or at Prosecutor Patrick Johnson's discretion.  At this point, Ms. Thomas' had satisfied the court's one-year probation, which ended December 12, 2009.

60.    Prior to this, Ms. Thomas, acting as pro se, filed a $3,000,000. lawsuit in federal court for unlawful arrest, excessive force, negligence and other claims on December 8, 2009.

61.    On January 25, 2010, the court of appeals released the mandate to the superior court for a new trial for Ms. Thomas.  She then took precautions and filed for public defender assistance.

62.     On March 5, 2010, Prosecutor Patrick Johnson met with Ms. Thomas' Public Defender in Superior court to enter on record to retry Ms. Thomas' trial, even though Ms. Thomas had already completed a year of probation and now was subjected to continue the payments of the $860 from her strained finances.  Trial date is set for April 5, 2010.

63.     Since 2002 as Ms. Thomas has continued to conduct her own investigation conducting extensive legal research and speaking to alternative law enforcement professionals for a perspective on her situation.  Many would respond "you are clearly being targeted for some reason" while other's stated, "you have a Fed problem."  In her further research she discovered a deplorable act called "Organized Stalking" that had many similar, but not all, characteristics of what she was experiencing.  Ms. Thomas learned through internet sources and some security professionals about how "illegal surveillance" is done "all the time" and that "Organize Stalking" is a group of individuals working on behalf of federal and local law enforcement to target a specific person, often African-Americans and Homosexuals, to spread rumors and lies throughout the community using their race or homosexuality against them that ultimately deteriorates the target's entire life.

64.     Ms. Thomas also repeatedly filed FOIA requests throughout the years and no records where found.

65.     She was however experiencing unsuspecting hostile work environments of mistreatment and rejection upon being hired, mail delay/tampering issues on her film projects, incidents of law enforcement presence at the time of the mailings, loss of job and wages, opportunities and potential income sources for her documentaries, experiencing a distance of fear or abrupt avoidance from complete strangers at places she frequented and discovering job opportunities

communicated by email or phone came with police presence or a surveillance tactic on the day

of the interview.

66.    In November 2006, Ms. Thomas resigned her position at the Spokesman Review to

concentrate on her film projects and upon arriving back from New Orleans concerning the

murder of her grandmother's funeral.  A message was left on her personal employee line from

John M. Bott, Drug Enforcement Agent, from the Seattle Field Division.  He addressed her by

name stating, "Denise, this is John Bott returning your call, feel free to reach me at 206-553-

5443."   Ms. Thomas returned his call and asked him what his call was about and assured him

she never called him.  He responded, "Oh, oops looks like a wrong number." And hung up

while laughing.   Ms. Thomas' grandmother had recently been killed by a distant relative

allegedly strung out on drugs.

67.    Prior to her resignation, she also informed her employer about her constant law

enforcement issues and was summoned to the president's office in an effort of support because

as she was told "he did not tolerate his minority employees being harassment by law

enforcement. " Ms. Thomas spoke directly with the president about her stops and upon request

provided him with her detailed 2004 complaint she filed to the Sheriff's office.  However, as a

couple weeks went by and she heard no reply, Ms. Thomas made attempts to make a meeting

with no success.  Eventually, she spoke with him in his office and the support changed to his

omission of getting pulled over sometimes and her 18 stops were nothing out of the ordinary.

It should also be noted, Ms. Thomas attempted to bring media attention about her stops from

the newspaper where she currently worked and was repeatedly put off and talked out of having

a story done.  Even still, Ms. Thomas' stops continued.

68.    Ms. Thomas continued with her investigation and requested public records from the

Spokane Sheriff's department and the Spokane Police records division seeking anything that

could possibly be triggering her being a subject of law enforcement. All records came back with nothing. None of the agencies reported any records of an investigation upon Ms. Thomas for any reason, Washington State Patrol returned records to reveal a 2002 DUI arrest and the Spokane Police Department reported having no records at all, yet Ms. Thomas did have a documented incident with the agency in 2005 for a theft of her car and no detective was assigned. She called repeatedly attempting to get information on the status of the incident and was told it had gone nowhere at the time even though fingerprints were taken.

69. As Ms. Thomas continued on with her life, she often noticed a high presence of law enforcement presence from Spokane Valley Police and Sheriff department patrol cars when she would leave and enter her residence at the time where she lived, traveling to and from her employment, social outings and when driving to and within the City of Spokane, a municipality, 15 miles away.

70. In the early part of December 2008, Ms. Thomas spoke with Spokane FBI Director Egon "Dez" Dezihan regarding her stops. She informed him she had went to their office directly and spoke with agent Frank Harrill who basically talked her out of filing any type of claim, even when she was at her 18th stop and saw no issue. Mr. Dezihan stated he would look into it and told Ms. Thomas to call back at the end of December or beginning of the new year as he was headed out to the middle east.

71. Ms. Thomas called in the beginning of January and left several messages on his voicemail with no returned call. When she followed up she was told Mr. Dezihan had retired.

72. Ms. Thomas decided to file a complaint as an "intent to sue" March 2009 with the proper SF 95 form to the Spokane Federal Bureau of Investigation under the Federal Tort Claims Act for negligence. She never received a reply.

73.    Ms. Thomas then contacted the DOJ Office of the Inspector General to inquiry why her "intent to sue" claim was not being acknowledged.

74.    She then received a call from Wayne Hawley a federal investigator from Tacoma, Washington.    He informed her he was just a "sole" investigator there for three regions and he would check into her concerns and get back to her.

75.    Ms. Thomas was later informed the Office of Inspector General was not the office that handled her claim and was told it had been sent to Processing Unit of the FBI in Washington, DC.

76.    May 2009, Ms. Thomas received a letter from Angela Byers, Unit Chief of the Initial Processing Unit stating because Ms. Thomas didn't state any specific information or details of what she was experiencing they considered the administrative claim closed.

77.    With that information, Ms. Thomas assumed her FTCA claim was dead in the water. However, Ms. Thomas looked further into her claim and conducting more legal research and realized the administrative claim Ms. Byers was speaking of was only the letter she had sent to Mike Hanley at the OIG and in fact was NOT a detail account of what she was experiencing, yet a general letter.

78.    Ms. Thomas also learned Ms. Byer's Unit was only for handling complaints against Federal Agents, it was not the legal department to dismiss her claim she had sent to the Spokane FBI.

79.    At this point, Ms. Thomas contacted the Initial Processing Unit and left a message stating the claim they denied was not a full detailed documented account of what she was experiencing and that it was merely a general letter she wrote that was forwarded by the OIG. She further stated her claim by FTCA procedure had a six-month deadline for reply.

80.    Within the next few days, Ms. Thomas was contacted by Frank Schwartz one of the legal counsel from the FBI office in Los Angeles.   He stated he had her claim sitting on his desk since March 2009 with the SF 95 form.

81.    On September 24, 2009, Cecila Bessee, Chief of the Civil Litigation Unit of the general counsel of the DOJ FBI unit sent Ms. Thomas a letter denying her legal claim, therefore giving Ms. Thomas six months according to FTCA administrative steps to enter a complaint in Federal Court.

### FIRST CLAIM FOR RELIEF
### (Conspiracy Against Rights )
### Title 18, U.S.C., Section 241

82.    Paragraphs 1-81 are incorporated herein by reference.

83.    Defendants collectively violated Ms. Thomas' rights by engaging in an unlawful illegal surveillance operation of harassment and conspiring with law enforcement stops, encounters and eventually an arrest.

84.    By reason of Ms. Thomas' continuous stops, encounters and arrest, she was injured suffering emotional distress, oppression, tarnish of reputation, great humiliating and embarrassing anguish, as she continued to exercise her right to freedom only to endure in the community the number of law enforcement stops, encounters and arrest, with some times her car being blocked off or surrounded by two or more police patrol cars, all to her damages.

85.     Title 18, U.S.C., Section 241, This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

86.     It further makes it unlawful for two or more persons to go in disguise on the highway or on the premises of another with the intent to prevent or hinder his/her free exercise or enjoyment of any rights so secured. Punishment varies from a fine or imprisonment of up to ten years, or both; and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years, or for life, or may be sentenced to death.

## SECOND CLAIM FOR RELIEF
### (Deprivation of Rights under Color of Law)
Title 18, U.S.C., Section 242

87.     Paragraphs 1-86 are incorporated herein by reference.

88.     Defendants collectively deprived Ms. Thomas' of her rights as they acted within the scope of their employment conspiring with local law enforcement officers doing the same.

89.     This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S.

90.     This law further prohibits a person acting under color of law, statute, ordinance, regulation or custom to willfully subject or cause to be subjected any person to different punishments, pains, or penalties, than those prescribed for punishment of citizens on account of such person being an alien or by reason of his/her color or race.

91.    Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties.

92.    This definition includes, in addition to law enforcement officials, individuals such as Mayors, Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who are bound by laws, statutes ordinances, or customs. Punishment varies from a fine or imprisonment of up to one year, or both, and if bodily injury results or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined or imprisoned up to ten years or both, and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

93.    As a result of defendant's deprivation of rights, Ms. Thomas' was injured suffering emotional distress, great mental, humiliating and embarrassing anguish, loss of wages, and was deprived of her constitutional rights, all to her damages.

### THIRD CLAIM FOR RELIEF
### (Invasion of Privacy)

94.    Paragraphs 1 – 93 are incorporated herein by reference.

95.    Defendants collectively willfully, intentionally violated Ms. Thomas' right to privacy by engaging in a unlawful illegal surveillance that stemmed from placing eavesdropping devices within her residences and automobile.

96.    The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home – a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their houses shall not be violated.'

97.    That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' Payton v. New York, 445 U.S. 573, 589-90 (1980) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). See also Kyllo, 533 U.S. at 44 (Stevens, J., dissenting) ("To be sure, the homeowner has a reasonable expectation of privacy concerning what takes place within the home . . . ."); United States v. Johnson, 457 U.S. 537, 552 n.13 (1982) ("At least since Boyd v. United States, 116 U.S. 616, 630 [ ] (1886), the Court ha[s] acknowledged that the Fourth Amendment accords special protection to the home."); United States v. Martinez-Fuerte, 428 U.S. 543, 562 (1976) ("[T]he sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection."); L.A. Police Protective League v. Gates, 907 F.2d 879, 884 (9th Cir. 1990) ("Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved.

98.    Plaintiff stated claim for invasion of privacy by intrusion based on FBI's illegal eavesdropping under FTCA; intrusion claim is not barred by libel or slander exceptions because plaintiff is not only suing for damage to her reputation, but instead for physical trespass and unlawful invasion of her privacy that caused that damage; Birnbaum v. United States, 588 F.2d 319, 328 (2d Cir.1978) (torts of trespass and invasion of privacy do not fall within intentional-torts exception).

99.    The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment."). If an individual has a reasonable expectation of privacy anywhere, he must surely reasonably expect privacy in his own home. Plaintiff stated claim for invasion of privacy by intrusion based on FBI's illegal eavesdropping under FTCA; intrusion claim was not barred by libel or slander exceptions because plaintiff was not just suing for damage to his reputation, but instead was suing for physical trespass and unlawful invasion of his privacy that caused that damage); Birnbaum v. United States, 588 F.2d 319, 328 (2d Cir.1978) (torts of trespass and invasion of privacy do not fall within intentional-torts exception).

### FOURTH CLAIM FOR RELIEF
### (Negligence)

100.    Paragraphs 1-99 are incorporated by reference.

101.    Negligent retention:  retaining an employee after the employer became aware of the employee's unsuitability, thereby failing to act on that knowledge.

102.    Negligent supervision: failing to provide the necessary monitoring to ensure that employees perform their duties properly.

103.    Negligent retention is the breach of an employer's duty to be aware of an employee's unfitness and to take corrective action through retraining, reassignment, or discharge.

### FIFTH CLAIM FOR RELIEF
### (Negligent Infliction Of Emotional Distress)

104.    Paragraphs 1-103 are incorporated by reference.

105.    That the defendants, by their actions as set forth above were negligent.

106.     That the defendants' negligence created an unreasonable risk of physical harm to the Plaintiff and caused the Plaintiff to be put in fear of her own safety.

107.     That the defendants have directly and proximately caused, by way of their negligent infliction of emotional distress upon the Plaintiff, the injuries, damages and losses set forth herein; and, the Plaintiff is entitled to recover against the defendants for damages caused by their conduct as set forth in this Complaint.  (intentional-infliction-of-emotional-distress claim not barred by FTCA's intentional-torts exception); Nurse v. United States, 226 F.3d 996, 999, 1002 (9th Cir.2000)

## SIXTH CLAIM FOR RELIEF
### (Malicious Harassment RCW 9a.36.080)

108.     Paragraphs 1-107 are incorporated by reference.

109.     The defendants intentionally committed malicious harassment against Ms. Thomas and violated her rights based on her race and sexual orientation.

110.     Malicious harassment — Definition and criminal penalty.  (1) A person is guilty of malicious harassment if he or she maliciously and intentionally commits one of the following acts because of his or her perception of the victim's race, color, religion, ancestry, national origin, gender, sexual orientation, or mental, physical, or sensory handicap:

(a) Causes physical injury to the victim or another person;

(b) Causes physical damage to or destruction of the property of the victim or another person; or

(c) Threatens a specific person or group of persons and places that person, or members of the specific group of persons, in reasonable fear of harm to person or property. The fear must be a fear that a reasonable person would have under all the circumstances. For purposes of this section, a "reasonable person" is a reasonable person who is a member of the victim's race, color, religion, ancestry, national origin, gender, or sexual orientation, or who has the same mental, physical, or sensory handicap as the victim. Words alone do not constitute malicious harassment unless the context or circumstances surrounding the words indicate the words are a threat. Threatening words

do not constitute malicious harassment if it is apparent to the victim that the person does not have the ability to carry out the threat.

111.    (2) In any prosecution for malicious harassment, unless evidence exists which explains to the trier of fact's satisfaction that the person did not intend to threaten the victim or victims, the trier of fact may infer that the person intended to threaten a specific victim or group of victims because of the person's perception of the victim's or victims' race, color, religion, ancestry, national origin, gender, sexual orientation, or mental, physical, or sensory handicap if the person commits one of the following acts:

112.    (a) Burns a cross on property of a victim who is or whom the actor perceives to be of African American heritage; or

(b) Defaces property of a victim who is or whom the actor perceives to be of Jewish heritage by defacing the property with a swastika.

This subsection only applies to the creation of a reasonable inference for evidentiary purposes. This subsection does not restrict the state's ability to prosecute a person under subsection (1) of this section when the facts of a particular case do not fall within (a) or (b) of this subsection.

113.    (3) It is not a defense that the accused was mistaken that the victim was a member of a certain race, color, religion, ancestry, national origin, gender, or sexual orientation, or had a mental, physical, or sensory handicap.

(4) Evidence of expressions or associations of the accused may not be introduced as substantive evidence at trial unless the evidence specifically relates to the crime charged. Nothing in this chapter shall affect the rules of evidence governing impeachment of a witness.

(5) Every person who commits another crime during the commission of a crime under this section may be punished and prosecuted for the other crime separately.

(6) "Sexual orientation" for the purposes of this section has the same meaning as in RCW 49.60.040.

(7) Malicious harassment is a class C felony.

(8) The penalties provided in this section for malicious harassment do not preclude the victims from seeking any other remedies otherwise available under law.

114.    (9) Nothing in this section confers or expands any civil rights or protections to any group or class identified under this section, beyond those rights or protections that exist under the federal or state Constitution or the civil laws of the state of Washington.

115.    That the defendants have caused the injuries, damages and losses to the Plaintiff by their outrageous conduct; and, the Plaintiff is entitled to recover against the defendants for the injuries, damages and losses set forth herein.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
<u>**(ILLEGAL SURVEILLANCE)**</u>
<u>**Foreign Intelligence Surveillance Act ("FISA", 50 U.S.C 1801 et seq)**</u>
<u>**(ILLEGAL WIRETAPPING and Electronic Eavesdropping)**</u>
<u>**18 U.S.C. 2511(1) RCW 9.73.030**</u>

116.    Paragraphs 1-115 are incorporated by reference.

117.    Defendants' used illegal surveillance pursuant 18 U.S.C. Secs. 2511 and 3504, that were the direct cause of the Plaintiff's series of encounters, stops, an arrest by local law enforcement and loss of income.  3504(b) defines the unlawful act to which claims may be directed as acts involving the use of electronic devices in violation of the constitution or federal law.

118.    Defendants' engaged in electronic surveillance to monitor conversations of plaintiff without obtaining prior court authorization, and defendants' subsequent use of the information obtained against plaintiffs, is in violation of the civil and criminal provisions to FISA.

As a result, all evidence by this illegal surveillance must be suppressed pursuant to 50 USC 1808(g). Further, plaintiff is entitled to liquidated and punitive damages pursuant to 50 USC 1810. Clavir v. United States, 76 Civ. 1071 (S.D.N.Y. September 29, 1978) (Fourth, Fifth, Sixth, Seventh, Eighth, And Fourteenth Amendments), Searches and Seizures [Ctn. 48] 300. NYCLU & NCBL v NYC Police & FBI. By Electronic Eavesdropping, 301.5 . Fonda v Gray, 301.5 . Weinberg v Mitchell, Hallinan v Mitchell 301.5 . Kissinger v Halperin , 301.64 . Handschu v Special Services Division , National Security Cases, 301.514 . Jabara v Kelley, 301.529 . Clavir v Levi, 301.536 . US v Gabriner , 301.537 . Kinoy v Mitchell , 301.538 . Moore v Levi,

119.    18 U.S.C. § 2515 : US Code - Section 2515: Prohibition of use as evidence of intercepted wire or oral communications, Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

120.    Defendants engaged in outrageous illegal surveillance tactics by communicating the plaintiff' financial woes and personal life to unsuspecting citizens for conspirator reasons to further violate the plaintiffs rights in her attempts to obtain income and exercise her rights to basic freedom.

121.    Defendants violated Ms. Thomas rights by intentionally engaging in illegal wiretapping of her cell phone, intercepted her email communications and placed eavesdropping devices within her residences, all to intercept her calls in relation to obtaining employment or potential income and to further track her whereabouts to alert local law enforcement.   It is prohibited that "any

employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock, trust, or corporation, 18 U.S.C. 2510(6). Conduct can violate Title III/ECPA when done intentionally.

122.    (a) In General. - Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.).

123.    (b) Exception. - The prohibition of subsection (a) does not apply with respect to the use of a pen register or a trap and trace device by a provider of electronic or wire communication service - (1) relating to the operation, maintenance, and testing of a wire or electronic communication service or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse of service or unlawful use of service; or (2) to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful or abusive use of service; or (3) where the consent of the user of that service has been obtained.

124.    (c) Limitation. - A government agency authorized to install and use a pen register or trap and trace device under this chapter or under State law shall use technology reasonably available to it that restricts the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications.

125.    (d) Penalty. - Whoever knowingly violates subsection (a) shall be fined under this title or imprisoned not more than one year, or both.

## **EIGHTH CLAIM FOR RELIEF**
## **(OUTRAGEOUS CONDUCT)**

126.    Paragraphs 1-125 are in corporated by reference.

127.    That the defendants' actions as set forth herein, were outrageous, intolerable and so extreme as to exceed all bounds of decency which prevail in civilized communities and societies.

128.    That the defendants, by their actions as set forth herein, intended to inflict irreparable damage to the Plaintiff's reputation, good name, honor, integrity and respect in the community.

129.    That as a direct and proximate result of the defendants' outrageous conduct, as set forth herein, the Plaintiff has suffered loss of her reputation, good name, honor, integrity and respect in the community.

130.    That the defendants have caused the injuries, damages and losses to the Plaintiff by their outrageous conduct; and, the Plaintiff is entitled to recover against the defendants for the injuries, damages and losses set forth herein.

## **PRAYER FOR RELIEF**

131.    Plaintiff demands a jury trial.

WHEREFORE, the Plaintiff enters an Order of Judgment in Plaintiff's favor against the

defendants for compensatory damages in an amount sufficient to fully compensate the

Plaintiff for her injuries, damages and losses;

    A.   Two million dollars for Ms. Thomas' non economic damages;

    B.   18 million dollars in punitive damages;

THE PLAINTIFF REQUESTS A TRIAL ON ALL ISSUES TO A JURY.

Dated: March 22, 2010

Denise Marie Thomas

Pro Se Attorney

By:

Denise Marie Thomas

Plaintiff